844 So.2d 540 (2002)
Joseph POTTER and Jamie Potter,
v.
FIRST REAL ESTATE COMPANY, INC., and Dawn Borden.
1010339.
Supreme Court of Alabama.
September 6, 2002.
*542 W. Lee Pittman and C. Carter Clay of Pittman, Hooks, Dutton & Hollis, P.C., Birmingham (rehearing brief filed by W. Lee Pittman, C. Carter Clay, and J. Chris Cochran of Pittman, Hooks, Dutton, Kirby & Hellums, P.C., Birmingham), for appellants.
Michael R. Lunsford and William Perry Webb of Porterfield, Harper & Mills, P.A., Birmingham, for appellees.

On Application for Rehearing
LYONS, Justice.
The opinion of May 24, 2002, is withdrawn, and the following is substituted therefor.
Joseph Potter and Jamie Potter filed an action to recover damages from Dawn Borden and First Real Estate Company, Inc., based upon allegations of misrepresentation, suppression, fraud, promissory fraud, breach of contract, negligence and recklessness in the sale of a house. Borden and First Real Estate moved for a summary judgment. The trial court denied the Potters' Rule 56(f), Ala. R. Civ. P., motion to continue the summary-judgment hearing and entered a summary judgment for First Real Estate and Borden on the ground that the statute of limitations barred the Potters' claims. The Potters appealed, but limited their submissions to this Court to the misrepresentation, suppression, fraud, and promissory-fraud claims. Therefore, those are the only claims before us. See Hannah v. Gregg, Bland & Berry, Inc., 840 So.2d 839, 852 (Ala.2002).

Pertinent Facts
The following discussion of the facts is based entirely on Joseph Potter and Jamie Potter's depositions and the documents underlying the sales transaction. First Real Estate did not submit an affidavit from Borden, and the trial court declined to postpone the hearing on the motion for a summary judgment to permit Borden to be deposed. We review the facts before the trial court at the time it ruled on the motion for a summary judgment in the light most favorable to the Potters, the nonmovants. Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C., 792 So.2d 369, 372 (Ala.2001).
In 1998 Joseph Potter and his then fiancée, Jamie, were looking to purchase their first house. Joseph had graduated from Birmingham-Southern College with a degree in graphic design and was working as a graphic designer. Jamie was working as a dental assistant and was living with her parents. Joseph and Jamie saw a "First *543 Real Estate" sign in the yard in front of Kimberly Boler's house. They telephoned the number on the sign and spoke with Borden, a real-estate agent employed by First Real Estate.
Joseph Potter, Boler, First Real Estate, and Borden entered into an agency agreement; that agreement provided as follows:
"Seller and Buyer hereby acknowledge and agree that First Real Estate and its Agent(s) (for convenience referred to together, or interchangeably as `Broker') are representing both Buyer and Seller and that Broker has been and is now the Agent of both Seller and Buyer with respect to this transaction. Seller and Buyer have consented to this dual representation.
"Seller, Buyer and Broker understand that Limited Consensual Dual Agency can create conflicts of interest. Therefore, Broker will not represent the interests of one party to the exclusion or detriment of the interest of the other party. Seller and Buyer, hereby acknowledge that Broker's relationship with them is not one of a fiduciary, and they waive all claims which they have now or which may arise in the future in connection with conflict of interest and/or limited consensual dual agency.
"The parties understand that because Broker represents both parties, Broker must endeavour to be impartial as between Seller and Buyer. Except as expressly provided below, Broker in its capacity as Limited Consensual Dual Agency, will disclose to both Seller and Buyer all facts and information which Broker believes are material or which might affect Seller's or Buyer's decisions with respect to this transaction, whether or not the facts or information would be confidential except for the limited consensual dual agency."
It is undisputed that Borden told Jamie Potter that she represented Joseph and Jamie "as much as she represented the seller."
Borden twice accompanied Joseph and Jamie to the house. Joseph Potter testified that during the first visit he asked Borden if the house was located in a flood plain. Joseph Potter further testified that Borden responded that to her knowledge it was not, but that she would check on a survey she had in her office. Borden told Joseph and Jamie that they could obtain another survey if they wished, but that the one she had was a recent one and that they could save money if they used it. During their second visit to the property, Borden brought with her a survey of the property that she purportedly had obtained from a prior owner. Borden showed the survey to Joseph Potter. In his deposition, Joseph Potter testified:
"I looked over it and there was something on there about the flood [plain] and it was hard to read. You know, I attempted to read it and she said, well, `it says it's not in a flood plain.' And I tried to read theyou know, it's got, `is, is not.' It was hard to decipher so I just took her word."
He further testified that he believed that the survey introduced into evidence by Borden and First Real Estate in support of their motions for a summary judgment was a copy of the survey Borden showed him during the second visit. However, Joseph also stated that the survey Borden and First Real Estate introduced into evidence was "easier to read" than the one he was shown during his second visit to the house. Comparing the survey introduced into evidence and the one he was shown on his second visit, Joseph testified:
"I can make out most of the words on [the survey introduced into evidence by the defendants] by guessing [their] *544 shape. [The survey I was shown at the house] was hard to make out ... half the words probably."
Joseph testified that the survey he was shown during the second visit to the house was "almost illegible."
On July 7, 1998, Joseph and Jamie met with Borden and Joseph executed an eight-page "Financed Sales/VA Contract" for the house. The sales contract stated: "THE PROPERTY ... ____ IS X IS NOT LOCATED IN A FLOOD PLAIN...." (Capitalization original.) At the July 7 meeting, Jamie asked if the property was in a flood plain, and Borden replied, "No." The sales contract also included a disclaimer that read, in part:
"Seller and Purchaser acknowledge that they have not relied upon the advice or representations of Broker ... relative to... (vii) the investment or resale value of the Property; ... or (ix) any other matters affecting their willingness to purchase the Property on the terms and price herein set forth. Seller and Purchaser acknowledge that if such matters are of concern to them in the decision to sell or purchase the Property, they have sought and obtained independent advice relative thereto."
Joseph placed his initials under this disclaimer. The sales contract also stated that "Neither Purchaser, Seller, nor Broker... shall be bound by any understanding, agreement, promise, or representation concerning the Property expressed or implied, not specified herein." An addendum to the sales contract stated that it was possible that sinkholes existed on the property and further stated:
"NO WARRANTY OR REPRESENTATION RESPECTING THE SOIL CONDITION OR ANY SUBSURFACE FAULT OR DEFECT, OR ANY OTHER CONDITION OF THE LAND ... IS MADE BY FIRST REAL ESTATE... OR ITS AGENTS OR SUBAGENTS."
(Capitalization original.) Joseph Potter placed his initials below this addendum.
At the closing on July 31, 1998, Joseph was given several documents in addition to the sales contract, including a copy of the survey of the property. On that survey, in small print, appeared a notation that once stated, before the presence of any handwritten marks, "the property described herein (is) (is not) located in a special flood hazard area." A slightly diagonal handwritten line moves from the lower left to the right over the words "is not." The record before us does not contain a document purporting to be the actual document presented at closing. For all that appears, we have only a photocopy.
Joseph Potter signed a certificate acknowledging that he had "received and approved a copy of the survey." Jamie did not sign any of the documents. According to Joseph's deposition, as is discussed later, the copy of the survey he was given at the closing was another copy of the same survey he described as "almost illegible" at the time he first saw that survey on his second visit to the house.
Joseph and Jamie married on October 23, 1998, and she moved into the house with him. The Potters testified that they first learned their property was in a flood plain on September 2, 1999, when they received a letter from their mortgage company stating that the property was in a flood plain and that they were required to purchase flood insurance. Joseph testified that when he received the letter he thought, "This can't be right, we're not in a flood plain," and he put the letter in a drawer. After he received a second letter from his mortgage company, he contacted a friend who consulted "some old maps" and told him that he thought part of the *545 Potters' property was in a flood plain. Joseph contacted an insurance agent and purchased flood coverage for the structure of the house. In March 2000, after heavy rains, the Potters' house flooded. Potter testified that he then consulted the survey he had received at the closing. He testified,
"It was very hard to read and I couldn't make out whether it said `is' or `is not' so it didn't end my questions."
On February 22, 2001, the Potters filed this action. On September 28, 2001, after the Potters unsuccessfully attempted to postpone consideration of Borden's and First Real Estate's motions for a summary judgment to allow further discovery, the trial court entered a summary judgment for Borden and First Real Estate, stating:
"The Court finds that the Plaintiff[s] [were] put on notice that the property in question was in a flood hazard zone and therefore the Motion for Summary Judgment filed 9/4/01 is GRANTED and judgment is rendered in favor of the Defendants and against the Plaintiff[s]."
On November 1, 2001, the trial court denied the Potters' motion to alter, amend, or vacate the judgment. The Potters appealed.

Standard of Review
We review a summary judgment de novo. American Liberty Ins. Co. v. AmSouth Bank, 825 So.2d 786 (Ala.2002).
"We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. `Substantial evidence' is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw."
Nationwide Prop. & Cas. Ins. Co., 792 So.2d at 372 (citations omitted), quoted in American Liberty Ins. Co., 825 So.2d at 790.

Discussion
The Potters' fraud claims are subject to a two-year statute of limitations. § 6-2-38(l), Ala.Code 1975; Ex parte Seabol, 782 So.2d 212, 216 (Ala.2000). However,
"[t]hat statute of limitations is subject to the `saving clause' provided by § 6-2-3:
"`In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action.'"
Seabol, 782 So.2d at 216. Section 6-2-3 supplies an objective test, tolling the statute of limitations on a fraud claim until the aggrieved party discovers or, in the exercise of reasonable care, should have discovered, the facts constituting the fraud. Seabol, 782 So.2d at 216; Foremost Ins. Co. v. Parham, 693 So.2d 409, 421 (Ala. 1997); Moulder v. Chambers, 390 So.2d 1044, 1046 (Ala.1980).
In Foremost, the plaintiffs asserted fraud claims arising from their purchases of insurance for their mobile homes. A salesman told the plaintiffs that a premium would not be required for their first year *546 of coverage. The salesman also sold them "adjacent structures coverage" in a "package policy," although the plaintiffs did not desire such coverage. However, the plaintiffs received "various sales documents..., all of which indicated that premiums were charged for the first year's coverage." Foremost, 693 So.2d at 414. Moreover, on the declarations page of the insurance policies the plaintiffs received, the letters "INCL" were typed under the line indicating adjacent-structures coverage. Foremost, 693 So.2d at 414-15. The plaintiffs relied on the salesman's oral representations; they did not read the documents. Foremost, 693 So.2d at 414. The plaintiffs conceded "that had they read their sales documents and insurance policies they would have learned that they had paid for their first year's coverage and that their policies included adjacent structures coverage." Foremost, 693 So.2d at 422.
This Court reaffirmed that the "reasonable-reliance" standard is the test for determining when an aggrieved person should have discovered the facts constituting the fraud. Foremost, 693 So.2d at 421. "`The question of when a party discovered or should have discovered the fraud is generally one for the jury.'" Seabol, 782 So.2d at 216, quoting Liberty Nat'l Life Ins. Co. v. Parker, 703 So.2d 307, 308 (Ala.1997). However, under the reasonable-reliance standard,
"the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms."
Foremost, 693 So.2d at 421. This Court held that "the plaintiffs received documents when they purchased their mobile homes ... that if read or even briefly skimmed would have put reasonable persons on notice [of the facts constituting the fraud]." Foremost, 693 So.2d at 421-22. However, the Court held that the reasonable-reliance standard would be applied prospectively in all cases filed after March 14, 1997, the date the opinion in Foremost was released, but would not be applied in Foremost itself. 693 So.2d at 421. Nevertheless, the Court commented that, had it applied the reasonable-reliance standard in that case, the plaintiffs' claims would have been barred by the statute of limitations because they received the documents more than two years before they filed their complaints alleging fraud and they testified that had they read those documents they would have learned of the fraud. Foremost, 693 So.2d at 422.
Two years ago in Seabol, we reversed a summary judgment for the defendant that had been entered on the basis that the statute of limitations barred the action, even though the plaintiff had received documents that could have alerted him to the fraud more than two years before the commencement of the action. In that case the plaintiff, a realtor, alleged that the defendants, his attorney and bank, knew that a mortgage on his property did not constitute a valid lien against six acres of his property as to future advances because the mortgage contained no provision to secure future advances. The plaintiff alleged that the attorney and the bank nevertheless represented to him that the property could be immediately foreclosed on in order to persuade him to sell the property to the attorney at a low price. 782 So.2d at 213-14. Although Seabol had possession of the mortgage and the promissory note more than two years before he commenced the action, we held that his fraud claim was not barred by the statute of limitations.
*547 Seabol, 782 So.2d at 213. Seabol's mortgage made no reference to future advances and, thus, was not a valid lien against the property as to any future advances. However, his promissory note for the future advances stated that it was secured by a mortgage. Seabol, 782 So.2d at 213.
We distinguished Foremost, holding that the documents Seabol was provided were "not as easily understood" as those in Foremost. Seabol, 782 So.2d at 216. In Foremost, all the documents provided to the plaintiff clearly showed that an insurance premium had been charged, contrary to the salesman's representations, and that adjacent-structures coverage was included. Moreover, the plaintiffs in Foremost conceded that had they read the documents they would have learned of the fraud. 693 So.2d at 422. In Seabol, we held that despite Seabol's knowledge of real-estate transactions and despite the fact that he had documents in his possession that might have revealed the fact he said was not disclosed, "a jury, taking Seabol to be a reasonable realtor, could find that his reliance on the oral representations of his attorney and his banker was reasonable." Seabol, 782 So.2d at 217.
Whether an agreement is ambiguous is a question of law for the trial court. ERA Commander Realty, Inc. v. Harrigan, 514 So.2d 1329 (Ala.1987). In the context of a contract action, an unambiguous agreement must be enforced as written. Homes of Legend, Inc. v. McCollough, 776 So.2d 741 (Ala.2000). It is clear that the trial court, notwithstanding Joseph's testimony as to his subsequent difficulty in reading the survey furnished him at the closing, concluded as a matter of law that the survey unambiguously informed the Potters that the property was situated in a flood plain. Based upon the documents before us that clearly show the words "is not" to have been struck through by a hand-drawn line, we cannot say that the trial court erred in reading the survey as giving the Potters notice that the property is situated in a flood plain. Potter's testimony that "I couldn't make out whether it [the survey included in the closing documents] said `is' or `is not' so it didn't end my questions," cannot override the trial court's holding on this question of law reserved for the court under our settled jurisprudence.
We cannot, however, end our inquiry at this juncture because to do so would overlook the fraud claims made the basis of this action. In other words, while, in an action based in contract, the contract that is the subject of the action must be enforced as written, the same rule may not apply in a fraud action. It has long been the settled law of this State that a party to a contract who is illiterate can allege fraud and thereby overcome the other party's reliance on the terms expressed in the contract. See, for example, Paysant v. Ware, 1 Ala. 160 (1840), where this Court stated:
"So, oral evidence is admissible to prove a fraudulent omission of some material part of an agreement. Thus, if a plaintiff, in reducing a contract to writing, between the defendant and himself, were to omit a material stipulation, and represent to the defendant, who could not read, that the writing was drawn according to the intention of both parties, the presumption of fraud would be so strong as to let in oral proof of what was their agreement. And in general, it may be shown, that fraud and imposition were practised upon a party to an instrument, by a fraudulent omission, or misrepresentation of the contents, especially, if the party were illiterate: Joynes v. Statham; 3 Atk. Rep. 388."
1 Ala. at 165-66 (emphasis added).
In Goetter, Weil & Co. v. Pickett, 61 Ala. 387 (1878), this Court held:

*548 "The evidence without conflict showed that he could read and write, and that he had ample opportunity of reading the note before signing it, and that he did read it so far as to ascertain its amount. There was no misrepresentation to him of the contents of the note, and if he has executed an instrument, he did not intend executing, his own negligence without any fraud or deceit of the party with whom he was dealing, is the cause. The fact that he did not read it, having full opportunity to do so, simply proves his negligence and inattention to his own interests, and in the absence of all misrepresentation or artifice by the party with whom he was dealing, was immaterial and irrelevant. A party who having full capacity and opportunity to read a paper, and to whom there is no misrepresentation of its contents, can not set up his own want of attentionhis failure to read it, as a fact to invalidate it."

61 Ala. at 390-91 (emphasis added).
The continued vitality of this doctrine is noted in Foremost, where this Court held that summary judgment is appropriate "where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents." Foremost, 693 So.2d at 421 (emphasis added). As previously noted, we distinguished Foremost in Seabol, where the complexities of a transaction requiring the correlation of multiple documents made it appropriate for the jury to determine whether Seabol was fully capable of understanding the documents.
The Potters recognize that Foremost permits the trial court to enter a summary judgment in the face of testimony from the plaintiff that he had not read the written documents. However, the Potters contend that Foremost does not empower trial judges to decide when discovery of the fraud should reasonably have occurred unless the undisputed evidence establishes that the fraud should have been discovered. To support their contention, the Potters direct our attention to cases decided under the reasonable-reliance standard, where this Court excused the victim of an alleged fraud from the consequences of the plain language of a document in face of evidence "that he was lulled into a feeling of security and into any neglect to read the same by the misrepresentations of the agent." See Southern Building & Loan Ass'n v. Dinsmore, 225 Ala. 550, 552, 144 So. 21 (1932). See also Arkel Land Co. v. Cagle, 445 So.2d 858 (Ala.1983); Bedwell Lumber Co. v. T & T Corp., 386 So.2d 413 (Ala.1980), and Cahaba Valley Dev. Corp. v. Nuding, 512 So.2d 46 (Ala.1987). Borden and First Real Estate offer us no aid in harmonizing these cases with Foremost, standing instead on a broad reading of Foremost.
It is not clear from Foremost whether Alabama cases predating the justifiable-reliance standard and allowing, under limited circumstances, misrepresentations that lull even a literate party into not reading the contents of an agreement create a jury question as to the reasonableness of the reliance, thereby tolling the running of the statute of limitations until the discovery of the inconsistency between the representations and the documents. We must therefore decide in this case whether, under the reasonable-reliance standard, evidence showing that a single clear and unambiguous document was submitted to a literate person at the time of closing always triggers the running of the statute of limitations, regardless of circumstances and events preceding the closing or events occurring at the closing.
The justifiable-reliance standard was first adopted in Hickox v. Stover, 551 So.2d 259 (Ala.1989). Under the justifiable-reliance *549 standard, a plaintiff "`has not justifiably relied on the defendant's representation if that representation is "one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth."'" 551 So.2d at 263 (quoting Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1091-92 (Ala.1989) (Hornsby, C.J., concurring specially)). Under this standard, any representation falling just short of being "patently and obviously false" required submission of the case to a jury. Hicks v. Globe Life & Accident Ins. Co., 584 So.2d 458 (Ala.1991), was decided soon after Hickox. Hicks was described in Foremost as follows:
"However, in Hicks, a plurality of this Court rejected the long-standing rule that our objective standard of reviewing the statute of limitations issue in fraud cases incorporated the duty to read a document upon its receipt or presentation; and it held that `[t]he question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff actually knew of facts that would have put a reasonable person on notice of fraud.' 584 So.2d at 463."
Foremost, 693 So.2d. at 418 (emphasis on "actually knew" in Hicks; other emphasis added).
Viewing the Foremost Court's description of the problem in Hicks as permitting a fraud case to go to the jury in all circumstances where all the plaintiff had to say was that he did not, in fact, know what the contract said, it is consistent with Foremost to recognize a jury question in a fraud case where the plaintiff's ignorance of the contents of a document is reasonable under the circumstances.
Such a result conforms to earlier Alabama cases decided before the adoption of the justifiable-reliance standard. The plaintiff in Southern Building & Loan Ass'n v. Dinsmore was a farmer with little or no experience in corporate transactions who, as a result of the fraudulent description of a document as being merely an "identification card," executed a subscription contract. Nothing in the opinion suggests that the plaintiff was illiterate. This Court stated the standard as follows:
"The argument for the affirmative charge is rested upon the possession by the plaintiff of the surplus certificate continuously from the time of its delivery to him and a knowledge of its contents imputed to him by the law. But plaintiff did not read the certificate and there is no evidence he had any actual knowledge of its contents, and his proof tends to show that he was lulled into a feeling of security and into any neglect to read the same by the misrepresentations of the agent. Under these circumstances the law imputes to him no knowledge of its contents."
225 Ala. at 552, 144 So. at 23. The Court then concluded:
"Plaintiff's proof tends to show he acted in entire ignorance of this scheme and in absolute reliance upon the representations made and read neither the card nor the surplus certificate. But no detailed discussion of the evidence is necessary to demonstrate the jury's right to infer from the evidence a gross fraud within the meaning of the above noted authorities."
225 Ala. at 553, 144 So. at 23. Three years before Hickox, in Holman v. Joe Steele Realty, Inc., 485 So.2d 1142, 1144 (Ala. 1986), this Court, albeit referring to the reliance in that case as "justifiable," upheld a summary judgment for the defendant and distinguished Dinsmore, stating:
"The instant case does not come within the rule of Southern Building & Loan Ass'n v. Dinsmore, 225 Ala. 550, 144 So. *550 21 (1932), that the law imputes no knowledge of a contract's contents to a party who signs the contract without having read or having knowledge of its contents, if that party is lulled into a feeling of security because of a misrepresentation of the contents of the contract and because of special circumstances, relationships, or disability of the party relating to the contract's execution. See also Arkel Land Co. v. Cagle, 445 So.2d 858 (Ala.1983); Rose v. Lewis, 157 Ala. 521, 48 So. 105 (1908). There is no evidence that the Holmans did not read or were incapable of understanding the import of the contract provision. There is no evidence of any special relationship between the Holmans or Clokey [the defendant real-estate broker] or any special circumstance or disability of the Holmans that would negate a finding that they knew of the contract provision. Moreover, there is no evidence of any misrepresentation of the content of the agreement or the employment of trick or artifice that would lull the Holmans into a false sense of security."
(Emphasis added.)
Pre-Hicks precedent in this Stateallowing a fraud case to go to a jury on the issue of reasonable-reliance, even when the plaintiff had documents in hand that he or she could have read, and, if read, were inconsistent with the statements allegedly relied onindicates that Foremost, with its return to the reasonable-reliance standard, does not always require a summary judgment for the defendant whenever the closing documents contradict the allegedly fraudulent misrepresentation. In our willingness to eliminate a standard that recognized a jury question whenever a plaintiff simply failed to read the agreement, we must avoid embracing a rule, inconsistent with our settled precedent, that would tolerate abuse of special relationships, particularly involving artifices to deceive as to the content of documents when presented at the time the agreement is memorialized. The challenge is to recognize those circumstances that make reliance reasonable even in the face of a clear contract document stating the fact alleged to have been misrepresented without setting a standard that returns us to the rule of Hicks whereby all a plaintiff had to say to sustain a fraud claim or to defeat a summary judgment on a fraud claim was that he never read the contract and that a fact had previously been misrepresented. Fortunately, Dinsmore and the pre-justifiable-reliance cases applying it spare us the task of reinventing the wheel. Moreover, the rule in Dinsmore falls within the mainstream of American jurisprudence. See Comment to Restatement (Second) Torts § 545A ("Thus one who presents a document to an illiterate man, misrepresenting its contents, and invites him to sign it, knowing that he cannot read it, cannot be heard to say that he is negligent in doing so. The same may be true when there is a relation of trust and confidence between the parties or the defendant has made successful efforts to win the confidence of the plaintiff and then takes advantage of it to deceive him.").
Examining the transaction in this case for its consistency with Dinsmore and its differences from Foremost, we first note that Borden told Jamie Potter that she represented Joseph and Jamie "as much as she represented the seller." Moreover, the agency agreement prepared by First Real Estate and executed by First Real Estate, Borden, Joseph Potter, and Boler states, "Broker will not represent the interests of one party to the exclusion or detriment of the interest of the other party." The agency agreement further states, "Broker in its capacity as Limited Consensual Dual Agency, will disclose *551 to both Seller and Buyer all facts and information which Broker believes are material or which might affect Seller's or Buyer's decisions with respect to this transaction." These facts presented the jury with a contractual basis that formalized the existence of a special relationship of trust or confidence between Borden and the Potters that included a duty to disclose and that lulled the Potters into a feeling of security. See Dinsmore, 225 Ala. 550, 144 So. 21 (1932). The duty to disclose is at the heart of the special relationship, and this duty was expressly assumed by contract and by statements made by Borden that she was representing the buyers as much as the sellers. See § 6-5-102 ("Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."). See also Bethel v. Thorn, 757 So.2d 1154, 1162 (Ala.1999), referring to the fraud claim in Deupree v. Butner, 522 So.2d 242, 244-45 (Ala.1988), as being supported by evidence "sufficient to show, as between the developer and the purchasers, a `special relationship' that gave rise to a duty to disclose." No special relationship existed between the insurance salesman and the purchaser in Foremost.
Joseph Potter was given documents that were inconsistent. The sales contract stated: "THE PROPERTY ... ____ IS X IS NOT LOCATED IN A FLOOD PLAIN ...." As earlier noted, the survey furnished at the closing indicated otherwise. No inconsistent documents were present in Foremost. According to Joseph, the survey shown to him at the time of his second visit to the property was almost illegible, yet the real-estate agent, who was acting as an agent for both Joseph Potter and the seller, looked at the survey and stated that the property was not located in a flood plain. The trial court has made no finding as to the clarity or import of this document. Joseph's testimony that the survey was almost illegible is the entire evidence before us on this point. No conflicting copies of the same document were present in Foremost. Again, according to Joseph, another copy of the same survey was included in the closing documents. At that time, he again asked Borden for assurances that the property was not located in a flood plain, and his agent gave such assurances. Although Joseph signed a certificate acknowledging that he had "received and approved a copy of the survey," that fact, under the circumstances of this case and especially in light of the aforementioned reassurance by Borden given at the closing, does not necessarily imply that he then read the survey. Had he signed a statement that clearly acknowledged that he had read the survey at the time of the closing, in light of our conclusion as to the correctness of the trial court's finding that the copy of the survey presented at closing was not ambiguous, a different case would be presented.
Under these circumstances, applying the standard in Dinsmore, as amplified in Holman, we conclude that there is evidence of a special relationship between the Potters and Borden, evidence indicating that Joseph was unable to read an earlier version of a document that was presented again at the closing in a legible condition, and evidence of renewed assurances that the document presented at the closing was consistent with the previous document described by Joseph as almost illegible. Suffice it to say that the conclusion reached in Holman, 485 So.2d at 1144 ("there is no evidence of any misrepresentation of the content of the agreement or the employment of trick or artifice that would lull the Holmans into a false sense *552 of security") does not apply to these facts. Here there is sufficient evidence to warrant a determination by the jury that there was a "misrepresentation of the content of the agreement or the employment of trick or artifice" at the time of the closing that lulled the Potters into a "false sense of security."
This application of the reasonable-reliance standard is consistent with Torres v. State Farm Fire & Casualty Co., 438 So.2d 757 (Ala.1983), described by Justice Houston in his dissent in Hickox, 551 So.2d at 266-67, as the appropriate standard by which reasonable reliance should be determined. In Torres, this Court stated as follows:
"In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover. Bedwell Lumber Co. v. T & T Corporation, 386 So.2d 413, 415 (Ala.1980).
"`If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "volunti non fit injuria."'
"Munroe v. Pritchett, 16 Ala. 785, 789 (1849)."
438 So.2d at 759 (emphasis added). On the record before us it cannot be said as a matter of law that the Potters blindly trusted their brokerwho acknowledged that she represented themwhere they should not have and closed their eyes where ordinary diligence required them to see.
Borden and First Real Estate also contend that an unambiguous reference on the survey to "Community Panel Number XXXXXXXXXX Panel 183 of 660, Jefferson County, Ala. Zone A-2," when read in connection with a document entitled "Insurance Requirements," admonishing the purchasers to secure adequate flood insurance on improvements located in FEMA maps "whose Zone Designations are ... AR/A1-30," should have put Joseph and Jamie on notice that the property was located in a flood plain. We conclude, as we did in Ex parte Seabol, 782 So.2d at 216, that "the documents at issue are not as easily understood" as those in Foremost. Hence, a jury question is presented.
Even absent the evidence the Potters sought leave to obtain in their Rule 56(f) motion, a jury, taking the Potters as reasonable first-time home buyers, could conclude that they reasonably relied on Borden's oral representations and the statement in the sales agreement that the property was not in a flood plain. Seabol, 782 So.2d at 217. See also Liberty Nat'l, 703 So.2d at 308. A jury could find that the two-year statute of limitations did not begin to run when the Potters received the survey at the closing, and their claims would not be time-barred. The trial court erred in entering a summary judgment based on a finding "that the Plaintiff was put on notice that the property in question was in a flood hazard zone." We hasten to add that we are viewing the evidence in a light favorable to the Potters, as we are required to do, and that we have no testimony before us from Borden and First Real Estate. However, any contradictory version of the transaction must be presented at trial.
Borden and First Real Estate argue that they cannot be liable to the Potters because, they say, they were acting as mere conduits of information between the buyer and the seller. However, in none of *553 the authorities relied upon by Borden and First Real Estate was the broker or agent acting as a dual agent. As already noted, according to the evidence before us, Borden told Jamie Potter that she represented the Potters "as much as she represented the seller." Moreover, according to Joseph, Borden looked at the document Joseph determined to be almost illegible and stated that the survey indicated that the property was not in a flood plain. Under the evidence before us, she was not acting merely as a conduit but was rather a direct source of information.
Borden and First Real Estate challenge Jamie's standing to bring the action because she did not enter into any contract to purchase the property nor did she take title to the property. In Doss v. Serra Chevrolet, Inc., 781 So.2d 973, 976-77 (Ala.Civ.App.2000), the Court of Civil Appeals addressed this issue:
"However, `[i]t is not necessary to an action for misrepresentation that there be a contractual relationship between the representor and the person deceived.' Mid-State Homes, Inc. v. Startley, 366 So.2d 734, 735-36 (Ala.Civ. App.1979). Similarly, `in an action alleging suppression of a material fact, a duty to disclose may be owed to a person with whom one has not had a contractual relationship or other dealings.' Carter v. Chrysler Corp., 743 So.2d 456, 461 (Ala.Civ.App.1998) (internal quotation marks omitted). Although Alabama law recognizes that persons who are not parties to a particular transaction generally have `no right of action [for fraud occurring during that transaction], there is an exception to this general rule: "If a third person is injured by the deceit, he may recover against the one who made possible the damages to him by practicing the deceit in the first place."' Thomas v. Halstead, 605 So.2d 1181, 1184 (Ala.1992) (quoting 37 C.J.S. Fraud § 60 (1944))."
(Emphasis added.)
Although Jamie was Joseph's fiancée at the time of the transaction made the basis of this action, this circumstance was known to Borden and First Real Estate, and her experience as a wife in a flooded house confers upon her standing to seek damages for fraud.
Based upon our resolution of this matter it is unnecessary to consider the issue urged on us by the Potters concerning the necessity for further discovery before the entry of the summary judgment. We reverse the summary judgment entered in favor of Borden and First Real Estate and remand the case for further proceedings consistent with this opinion.
APPLICATION OVERRULED; OPINION OF MAY 24, 2002, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
MOORE, C.J., and HOUSTON, JOHNSTONE, and WOODALL, JJ., concur.
HARWOOD, J., concurs specially.
SEE, BROWN, and STUART, JJ., dissent.
HARWOOD, Justice (concurring specially).
I concur with the main opinion. I write specially to comment further on the standing of Jamie Potter to participate as a plaintiff with respect to the claims presented on appeal. Certain facts in addition to those stated in the main opinion serve to reinforce in my mind the conclusion reached in the main opinion that Jamie has such standing.
The realtor in this case, Dawn Borden, clearly understood by the time of her first *554 meeting at the house with Joseph Potter and Jamie that they were engaged to be married in the near future and that they were looking for a marital home. Borden, as a realtor, presumably understood that, even if title to the home was taken solely in Joseph's name, Jamie would acquire homestead rights in it as his wife. Joseph and Jamie were again together, as an engaged couple, when Borden met with them at the house for a second visit. After that visit, the three of them traveled to Borden's nearby office, and Joseph made an offer on the house. The clear import of the respective deposition testimonies of Joseph and Jamie is that the various statements Borden made on those occasions concerning the non-flood-plain status of the property were directed to both of them. Joseph and Jamie were again both present at the closing of the transaction, on July 31, 1998, and Jamie was the one who broached again the question whether the property was possibly in a flood plain. Borden, in response to Jamie's inquiry, once again stated that it was not. As noted in the main opinion, Borden had told Joseph and Jamie "that by law she had to represent them as much as she represented the seller."
Viewing all of these facts in a light most favorable to the Potters, and according them the benefit of all inferences reasonably to be derived from those facts, as we are bound to do in reviewing a summary judgment, it is clear that Jamie was an intended recipient of the information imparted by Borden concerning the flood-plain status of the property and that she was expected to act in reliance on it. It is certainly a reasonable inference that when an engaged couple is jointly dealing with a realtor concerning the acquisition of a marital home, and the wife-to-be participates as fully as did Jamie in all of the discussions and dealings concerning the home, she would have a strong, if not decisive, voice in whether a particular house was selected.
SEE, Justice (dissenting).
I dissent from the main opinion's holding that the Potters' decision to enter into a contract without fully ascertaining its terms or making an independent inquiry when faced with ambiguities in that contract frees them from the operation of the statute of limitations on their fraud claims. The trial court found that the Potters had entered into a contract that stated that the house was in a flood plain, a conclusion the main opinion does not reverse. I agree with the statement in the main opinion that Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997), with its return to the reasonable-reliance standard, does not always require a summary judgment for a defendant whenever the closing documents contradict the allegedly fraudulent misrepresentations; however, I am mindful of the troubling history of the justifiable-reliance standard, which relieved plaintiffs from the burden of reading contracts and acting within some limitations period. Nor do I think that the language in Ex parte Seabol, 782 So.2d 212, 216 (Ala.2000), that "the documents at issue are not as easily understood" as those in Foremost is a meaningful standard to guide us through this thicket. Consistent with my previous writings on this subject, concurring specially in Foremost and concurring in part and dissenting in part in Ex parte Seabol, I do not find reasonable the Potters' reliance on the representations of the real-estate agent who was acting in a dual capacity as an agent for both the buyers and the seller. To hold otherwise, as discussed in my special writing in Foremost, is to sever the "bond between the right to rely and the responsibility to act reasonably." 693 So.2d at 439 (footnote omitted). I therefore dissent from the reversal of the summary *555 judgment for First Real Estate and Dawn Borden as to the Potters' fraud claims.
BROWN and STUART, JJ., concur.