COBB, Chief Justice
(dissenting).
I respectfully dissent.
Before it decided Hickox v. Stover, 551 So.2d 259 (Ala.1989), in which it adopted the justifiable-reliance standard, this Court had applied a reasonable-reliance standard in regard to a fraud claim. However, several exceptions existed at that time to the reasonable-reliance standard. For example, an illiterate party to a contract could allege fraud and overcome the other party’s reliance on the terms of a written contract. Paysant v. Ware, 1 Ala. 160 (1840). Another exception existed based on the relationship between the parties. In Southern Building & Loan Ass’n v. Dinsmore, 225 Ala. 550, 144 So. 21 (1932), a case involving the sale of stock, this Court held: “But plaintiff did not read the certificate and there is no evidence he had any actual knowledge of its contents, and his proof tends to show that he was lulled into a feeling of security and into any neglect to read the same by the misrepresentations of the agent. Under these circumstances the law imputes to him no knowledge of its contents.” 225 Ala. at 552, 144 So. at 23. This exception was more fully articulated by this Court in Holman v. Joe Steele Realty, Inc., 485 So.2d 1142, 1144 (Ala.1986):
“The instant case does not come within the rule of Southern Building & Loan Ass’n v. Dinsmore, 225 Ala. 550, 144 So. 21 (1932), that the law imputes no knowledge of a contract’s contents to a party who signs the contract without having read or having knowledge of its contents, if that party is lulled into a feeling of security because of a misrepresentation of the contents of the contract and because of special circumstances, relationships, or disability of the party relating to the contract’s execution. See also Arkel Land Co. v. Cagle, 445 So.2d 858 (Ala.1983); Rose v. Lewis, 157 Ala. 521, 48 So. 105 (1908). There is no evidence that the Holmans did not read or were incapable of understanding the import of the contract provision. There is no evidence of any special relationship between the Holmans or Clokey or any special circumstance or disability of the Holmans that would negate a finding that they knew of the contract provision. Moreover, there is no evidence of any misrepresentation of the content of the agreement or the employment of trick or artifice that would lull the Holmans into a false sense of security.”
When it decided Hickox v. Stover, supra, in 1989, this Court departed from its longstanding jurisprudence regarding reasonable reliance and adopted a justifiable-reliance standard for fraud claims. However, in 1997, with Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997), this Court discarded the justifiable-reliance standard and once again adopted the reasonable-reliance standard that had for so long governed fraud claims in Alabama. Foremost, however, left unanswered the question whether in readopting the reasonable-reliance standard this Court had readopted all the caselaw regarding the reasonable-reliance standard, including the exceptions to the application of the standard recognized by this Court before Hickox. In Potter v. First Real Estate Co., 844 So.2d 540 (Ala.2002), this Court deter *1218 mined that the exceptions to the reasonable-reliance standard had survived the justifiable-reliance era in Alabama jurisprudence.
Potter concerned a young engaged couple who had located a house they wanted to purchase and had contracted with the listing agent to represent them, the buyers, as well as the seller. The agency contract stated, in pertinent part:
“ ‘Seller, Buyer, and Broker understand that Limited Consensual Dual Agency can create conflicts of interest. Therefore, Broker will not represent the interests of one party to the exclusion or detriment of the interest of the other party. Seller and Buyer, hereby acknowledge that Broker’s relationship with them is not one of a fiduciary, and they waive all claims which they have now or which may arise in the future in connection with conflict of interest and/or limited consensual dual agency.
“ ‘The parties understand that because Broker represents both parties, Broker must endeavor to be impartial as between Seller and Buyer. Except as expressly provided below, Broker in its capacity as Limited Consensual Dual Agency, will disclose to both Seller and Buyer all facts and information which Broker believes are material and which might affect Seller’s or Buyer’s decisions with respect to this transaction, whether or not the facts or information would be confidential except for the limited consensual dual agency.’ ”
844 So.2d at 543. One of the buyers asked the agent if the house was located in a floodplain, and the agent responded by showing the buyer an “almost illegible” survey and told him that the survey showed that the house was not located in a floodplain. The agent had the buyers execute a contract for the sale of the house that stated: “ ‘THE PROPERTY ... _ IS X IS NOT LOCATED IN A FLOOD PLAIN ....’” 842 So.2d at 544. At the closing, the buyers were given a copy of the survey of the property, which contained in small print the following statement: “ ‘[T]he property described herein (is) (is not) located in a special flood area.’ ” A slightly diagonal handwritten line was drawn through the words “is not.” Thirty-two months after the closing the house flooded, and the buyers sued, alleging fraud.
The trial court, applying the reasonable-reliance standard, entered a summary judgment in favor of the real-estate agent, reasoning that the buyers’ claims were time-barred because the buyers knew or should have known at the time of the closing that the house was located in a floodplain. This Court reversed the summary judgment, concluding, based on Dinsmore and Holman, that a special relationship existed between the buyers and the agent and that, thus, the buyers could not be deemed to have reasonably relied on the documents given to them at closing in view of the representations made by the agent.
I respectfully disagree with my colleagues’ rationale that a special relationship may exist between a home buyer and a real-estate agent but that no similar relationship could exist between a pastor and a congregant. In its opinion, the majority states:
“The exception to the rule discussed in Potter does not apply in this case, however, because Smith and Jeffrey do not have the kind of relationship that was present between the plaintiffs and the defendant in Potter. Had Jeffrey been the minister and Smith the congregant, a different situation might exist, but that case is not presented here.”
5 So.3d at 1210. The relationship in Potter appears to have been purely contractual; *1219 nothing in that opinion indicates that the buyers and the agent had any personal interaction before the buyers saw the agent’s name on the “for sale” sign in front of the house they wanted to buy and telephoned the agent. The facts in this case, however, show that a personal relationship existed between Smith and Jeffrey before the purchase of the life insurance policies arising out of their relationship as a pastor and a congregant. Smith testified as follows:
“[SMITH’S ATTORNEY]: Bob, I want to start sort of the next subject matter with you here, as to how you first knew Mr. Jeffrey, Eddie Jeffrey. Can you tell the jury about that?
“[SMITH]: Eddie and his family were members of Parkway Christian Fellowship. They might have even been members of Huffman Assembly, which later changed its name to Beacon of The Cross. My recollection is they were members of the Huffman Assembly also, but he was — they were members of the Parkway Christian Church the 10 years that I was the pastor.
“[SMITH’S ATTORNEY]: So they were actually regular members, attending members?
“[SMITH]: They were regular members. His wife, a beautiful voice, she was a soloist in the choir. Two kids that, as I remember, I dedicated both of them when they were infants. So they were members of the church, very active in the church, yes, sir.
“[SMITH’S ATTORNEY]: Before you actually had some dealings with him on a business point of view or from a business point of view, did you ever know anything about him that made you be cautious about what he did or what he might say? Did you ever have any concern that he was anything less than honest?
“[SMITH]: No. It was quite the contrary.”
Save immediate family, many people of faith are closer to their pastors than to any other individuals. A minister of the gospel baptizes an individual, guides a new believer as he or she makes a profession of faith, performs a congregant’s wedding and counsels the betrothed as they prepare for their wedding, and performs a congregant’s funeral and comforts the bereaved family. A congregant often shares his or her life troubles with the pastor and seeks the pastor’s guidance. So intimate is the relationship between a congregant and a member of the clergy that this Court has seen fit to promulgate an evidentiary rule that makes communications between a member of the clergy in his professional capacity and another person a privileged communication. Rule 505, Ala. R. Evid. Neither is the relationship between a minister of the gospel and his congregant a one-way relationship. Such a relationship requires trust and faith on part of both individuals.
Given the foregoing, I am unable to agree with my colleagues that a special relationship could not exist between Smith and Jeffrey. In Potter, the purchasers of the house had no personal relationship with the real-estate agent before purchasing the house. In fact, their first contact with the agent was when the purchasers called the agent’s telephone number listed on the sign in front of the house they •wanted to buy. If a contractual relationship between a home buyer and a real-estate agent that is not preceded with any personal relationship can be of such nature that a buyer is “lulled into a feeling of security because of a misrepresentation of the contents of the contract and because of special circumstances [or] relationships,” Holman, 485 So.2d at 1144, then it seems equally, or more, likely that a pastor could *1220 be “lulled into a feeling of security” by his congregant, whom he has befriended and spiritually shepherded for many years.
I also respectfully disagree with the majority that the fact that Jeffrey made no additional oral representations at the time the policy was delivered to Smith distinguishes this matter from Potter. The record indicates that Jeffrey showed Smith only one illustration regarding the performance of the life-insurance policy during the sale of the policy. That illustration indicated that the policy would be in effect until Smith was 95 years old and that the premium would remain constant. When Jeffrey delivered the policy to Smith, he did not inform Smith that the policy had been rated on a different rating schedule or that the policy would require larger premiums in order to remain in effect until Smith was 95. AmerUs’s own agent, George Brooks, testified that at the time the policy was issued that he felt “that Central Life [AmerUs’s predecessor] did specific things that allowed the — where a lot of individuals had to rely upon interpretation from the agent.” Brooks also agreed that a lot of the information provided in the policies was misleading because “there were things in the wording and the way things were laid out that allowed the individual to come up with the wrong assumption.” The misrepresentation made in this case is as egregious as the misrepresentation made in Potter. I believe that, by his silence at delivery, Jeffrey perpetuated the misrepresentation he had made to Smith during the sale of the life-insurance policies.
Accordingly, I conclude that the jury’s verdict should be upheld because a special relationship existed between Smith and Jeffrey as pastor and congregant, thus invoking an exception to the reasonable-reliance standard. If the majority is of the opinion that Potter should not be the law, then instead of attempting to distinguish this case from Potter, it should overrule Potter. Thus, I respectfully dissent.