SHAW, Justice
(concurring specially).
I concur fully in the Court’s answer to the certified question. I write specially to note the following.
First, some preliminary observations:
*678 1. The certified question is not posed within the context of a defective-product case. See note 13, infra. Our answer to the certified question in no way holds that a manufacturer of a product may be held liable, under general products-liability jurisprudence, for a product manufactured by another.
2. The certified question calls for an explanation of, and our answer applies, current Alabama law. We are not creating new law or doing something novel; we are applying established law to a factual and legal scenario that has never been addressed by this Court. Concomitant with that, we discuss Alabama law as it exists, not how some perceive it should exist.
3. Given the nature of the federal government’s pervasive regulation of the prescription-drug industry, our answer is extremely narrow in scope and cannot conceivably apply outside that context.
4. No decision of any other jurisdiction addresses the precise question of Alabama law discussed in our answer.[12]
The certified question asks this Court to apply current Alabama law as it relates to fraud.[13] For purposes of examining the purely legal issue presented in this certified question, I believe that we must accept the factual allegations of the plaintiffs, Danny Weeks and Vicki Weeks, as true. Those allegations are summarized as follows: Wyeth produced the brand-name drug Reglan, which is metoclopramide, and, through its “labeling” of the drug, misrepresented or failed to provide important facts to Danny Weeks’s doctor about how metoclopramide is to be taken properly.[14]
When Wyeth’s ability to produce and sell metoclopramide exclusively lapsed, generic-drug companies became able to manufacture and sell metoclopramide. Those generic-drug companies may have wished to give Danny’s doctor different facts or instructions about the use of metoclopram-ide, but, for all intents and purposes relevant in this case, the federal government will not allow them to do so. Essentially, federal law requires that those generic-drug companies repeat Wyeth’s alleged misrepresentations or omissions. Wyeth *679 knew that the generic-drug companies are required to do this; Wyeth knew that its instructions on the use of metoelopramide would be repeated by the generic-drug companies. The federal government has declared that generic-drug companies cannot be sued if a doctor prescribes and a patient takes metoelopramide manufactured by a generic-drug company in the manner in which Wyeth represented that it should be taken. In other words, the generic-drug companies must repeat Wyeth’s purportedly fraudulent conduct and cannot be sued for doing so if Wyeth’s misconduct ultimately harms the patient.
In this context, we look to see whether, “[ujnder Alabama law, [Wyeth may] be held liable for fraud or misrepresentation (by misstatement or omission), based on statements it made” about metoclopram-ide. As discussed below, Alabama law allows a plaintiff to sue a defendant based on the defendant’s fraudulent conduct directed to a third person. A prior relationship between the two parties is not necessary. Two factors have been the focus of this case: foreseeability and duty. Although a controlling issue in other jurisdictions, I see no dispute as to foreseeability. As even Justice Murdock’s dissenting opinion agrees, it is “eminently” foreseeable “that a generic version of a brand-name drug will be consumed in reliance upon labeling disseminated by the brand-name manufacturer for its brand-name drug.”[15] 159 So.3d at 686.
In cases where fraudulent conduct is directed to third parties, this State’s case-law generally holds that a duty to disclose may be owed to a person with whom the defendant has had no prior dealings, specifically, where there is a “duty” not to make a false representation:
1. To those to whom a defendant intends, for his or her own purposes, to reach and influence by the representation;
2. to those to whom the defendant has a public duty created by statute or pursuant to a statute; and
3. to those members of a group or class that the defendant has special reason to expect to be influenced by the representation.
Hines v. Riverside Chevroleh-Olds, Inc., 655 So.2d 909, 919-20 (Ala.1994),[16] and Carter v. Chrysler Carp., 743 So.2d 456, 461 (Ala.Civ.App.1998); see also generally Potter v. First Real Estate Co., 844 So.2d 540, 553 (Ala.2002), and Colonial Bank of Alabama v. Ridley & Schweigert, 551 So.2d 390, 396 (Ala.1989).
In Hines, this Court held that an automobile manufacturer had a duty to disclose to subsequent purchasers of an automobile it had manufactured that the automobile had been repainted, even though the manufacturer had no relationship with the later purchasers, “[b]eeause the [subsequent purchasers] were members of a group or class of persons who [the manufacturer] expected or had special reason to expect would be influenced by its decision not to disclose information....” 655 So.2d at 920. Thus, they “had a sufficient relationship on which to base a duty to disclose.” Id. In Carter, an automobile manufacturer repurchased under the Lemon Law- an automobile that was allegedly defective. This fact was disclosed to the party to whom the *680 automobile was next sold. The Court of Civil Appeals held, however, that the Lemon Law created a duty to ensure that the fact that the automobile had been repurchased was disclosed to those who would later purchase the automobile from the second buyer, even though the manufacturer had no relationship with those later purchasers.
In both Carter and Hines there was a duty to not misrepresent or omit facts to those with whom the automobile manufacturers never had contact. Although those cases involved products that were actually manufactured by the defendants, the logic behind the creation of the duty has nothing to do with that fact. Here, federal law has created a scheme in which persons who purchased metoclopramide manufactured by generic-drug companies would have to rely on Wyeth’s representations about me-toclopramide. Thus, Wyeth had a “special reason to expect” that purchasers of the generic metoclopramide “would be influenced” by its labeling information because that information — owing to federal law— would be the only information purchasers of both brand-name and generic metoclo-pramide would receive. That the metoclo-pramide was made by another manufacturer creates no distinction: for purposes of this case, metoclopramide is the same no matter who produced it. As required by federal law, Wyeth’s alleged misrepresentations or omissions concerning metoclo-pramide also applied to metoclopramide manufactured by a generic-drug company. What Wyeth allegedly said (or failed to say) in its “labeling” about metoclopramide was intended to “reach and influence” users (through doctors or other health professionals) of metoclopramide, which, at that time, was manufactured only by Wyeth. This labeling, as required by federal law, also reached and influenced purchasers of generic metoclopramide. This federal law gave Wyeth “special reason to expect” that all users of metoclopramide would be influenced by its labeling.
Our answer to this certified question on original submission has generated many responses, some of which expressed valid concerns, while others either shamefully misrepresented our holding or bordered on the hysterical. Our answer, however, is extraordinarily narrow in scope. The posture in which the certified question is asked (assuming a fraud cause of action), the facts of this case, and the impact of strict federal regulation on the prescription-drug industry drastically confine our holding and wholly remove the facts of this case from situations where parties are allegedly being held liable under general products-liability theories for products they did not make. I cannot see our answer to the certified question as in any way speaking to the applicability of Alabama law outside the narrow context created by federal law in this case.
I must disagree with the implication that our answer is based on a motivation other than stating current Alabama law. Nothing in our answer suggests that this Court is trying to “correct” a “wrong” “with a second ‘wrong” or to “correct” “unfairness” created by the federal government. 159 So.3d at 686 (Murdock, J., dissenting). Although the members of this Court might respectfully disagree as to what Alabama tort law does or should require, our answer does nothing more than apply established Alabama decisions (which have not been challenged) to a difficult and unique factual and legal scenario.
I also respectfully reject the implication that our answer, applying as it does established Alabama tort law providing a remedy for fraudulent conduct, might “create a climate in which trade and business innovation” cannot flourish or that it prevents “Americans [from] working] hard to pro *681 duce innovative goods and services that have benefited not only themselves, but also their children, their communities, and America as a whole.” 159 So.3d at 684 (Murdock, J., dissenting). Allowing fraudulent or tortious conduct in the marketplace to go unchecked — if that is what has occurred in this case — would not seem to promote this policy. The legal analysis set forth in this Court’s answer, in my view, creates no new law, enforces existing law, and epitomizes the kind of judicial restraint that should be expected of an appellate court.

. Certain federal district court decisions cited in this Court’s answer address the issue under the law that existed before the Supreme Court’s decision in PLIVA, Inc. v. Mensing, 564 U.S. -, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011), and are thus distinguishable. The numerous decisions from other jurisdictions that rely on principles rejected by PLIVA are similarly distinguishable.

. Given that the federal district court has decided that the action is not an Alabama Extended Manufacturer’s Liability Doctrine ("AEMLD”)/defective-product action, I decline to accept the invitation of Wyeth to recharacterize the action under the anti-circumvention rule stated in Pfizer, Inc. v. Farsian, 682 So.2d 405 (Ala.1996), as one that is, in substance, alleging a defective-product claim and not a fraud claim. The application for rehearing takes this Court to task for failing to address this issue. However, as this Court's answer explains, citing Tillman v. R.J. Reynolds Tobacco Co., 871 So.2d 28, 34-35 (Ala.2003), AEMLD claims and fraud claims are different. As cast by the district court in the question presented to us, this case presents a fraud action. I express no opinion as to whether it should be recharacterized. Thompson-Hayward Chemical Co. v. Childress, 277 Ala. 285, 169 So.2d 305 (1964), cited by Wyeth on rehearing, involves a negligence action, not a fraud action, and thus is inapplicable.

.Danny’s doctor wrote him a prescription for "Reglan” and directed its use; Danny’s pharmacy filled the prescription with meto-clopramide that was manufactured by someone other than Wyeth. It is the doctor's prescribed use of metoclopramide, which we must assume was based on what Wyeth told or failed to tell the doctor, that caused Danny's injury.

. Thus, the numerous decisions of other jurisdictions that would hold that the injury that allegedly occurred in this case was not foreseeable are distinguishable. I would be hesitant to cite decisions rejecting foreseeability, as well as decisions that predate PLIVA, as calling into question the rationale of this Court’s answer to the certified question.

. Hines was overruled on other grounds by State Farm Fire & Casualty Co. v. Owen, 729 So.2d 834 (Ala.1998). See note 10, supra.