Jimmy Smith[1] sued Medtronic, Inc., alleging that he had sustained injury as the result of an allegedly defective wire of a Medtronic model 6972 heart pacemaker lead.[2] The trial court entered a summary judgment for Medtronic, holding that Smith's claims were barred by the applicable statute of limitations.[3] Smith appeals. We reverse and remand.[4]
The facts, viewed in the light most favorable to Smith, the nonmoving party, in accordance with our applicable standard of review, are as follows: In 1981, Smith underwent the surgical implantation of a Medtronic 5984 heart pacemaker, which was manufactured, designed, sold and/or distributed by Medtronic. In August 1983, Smith was operated on for problems associated with this pacemaker; during the surgery, Dr. Robin Lake, Smith's treating physician, found that the existing Medtronic model 6962 lead used with the pacemaker had fractured and needed replacing. Dr. Lake replaced the defective model 6962 lead with a Medtronic model 6972 lead. Subsequently, in December 1984, because Smith had experienced problems with his pacemaker, Dr. Lake replaced the then existing Medtronic 5984 pacemaker with a Medtronic Symbios model 7006 pacemaker with dual leads. Dr. Lake also determined that the insulation of the existing model 6972 lead had deteriorated and needed replacing, but, because of the severely degraded condition of the defective lead, Dr. Lake decided that it could not be removed without endangering Smith's life. Dr. Lake cut off the excess portion of the defective model 6972 lead, thereby rendering it inactive, covered the end of the lead with a cap, and left it inside Smith's body. According to Dr. Lake, it was better to leave the inactive defective lead inside Smith, because it had caused no injury to Smith and, in patients in general, the presence of an inactive lead causes no injury and is well tolerated by the body:
 "During [the operation in 1984], I inspected the malfunctioning [6972] lead. It became clear at that time that it would *Page 158 
be unsafe for me to remove the lead by the usual technique of simply pulling the lead out. The insulation around the lead wire crumbled with very little manipulation. . . . The presence of a[n] . . . inactive lead (here, the [6972] lead) is usually of no consequence to the patient, as the body normally adapts to the presence of this inactive lead without difficulty. In my opinion, it was not injurious to [Smith] for the [6972] lead [the inactive defective lead] to be left inside his heart, and [it] had caused and was causing no physical injury to [Smith] at that time. I was further of the opinion that the [6972] lead could remain in the heart safely capped without causing harm to [Smith]."
(Emphasis added.) Dr. Lake continued to see Smith as a patient over the next five years (between 1984 and March 1990). During that time Dr. Lake took routine X-rays of Smith that revealed no further problem and no injury from the defective inactive lead (no further problem with the lead insulation and no problem with the lead wire) nor any life-threatening situation for Smith. On March 14, 1990, however, Dr. Lake performed another routine X-ray, which indicated a deterioration of the lead wire, as opposed to the defective insulation around the wire — the lead wire was breaking off in such a way that a portion of the lead wire could fall into Smith's heart, causing heart failure and possibly death. According to Dr. Lake:
 "It was [on March 14, 1990], from viewing [a routine chest] X-ray, that I noticed deterioration of the [6972] lead wire (as opposed to the insulation around the lead wire); specifically that the [6972] lead wire had broken inside the subclavian vein. The proximal portion of the lead wire, which was inside the subclavian vein, was being held in place only by a piece of the plastic defective insulation. It was at this point that I opined that the defective lead had become injurious and potentially life threatening to [Smith]. . . . Prior to the March 14, 1990, routine X-ray, the lead wire had not broken inside the subclavian vein. The broken lead wire being present in [Smith's] circulatory system
connecting directly to his heart, specifically the subclavian vein, on March 14, 1990, presented a very likely life threatening situation.
 ". . . I felt that [Smith] was very much at risk of dying if the lead and broken wire were to be left in place. The broken lead, if left in place at this time in the subclavian vein, could break completely away and possibly perforate the heart, cause an abnormal heart rhythm, and even cause cardiac arrest and sudden death."
(Emphasis added.) Dr. Lake also discovered that the two leads he had implanted in 1984 to replace the defective inactive lead had also fractured and required replacement. Dr. Lake referred Smith to Dr. Charles Byrd, who operated on Smith in July 1990 to extract all of the existing leads (including the defective inactive lead) and to implant a new pacemaker system. Due to severe scar tissue at the subclavian vein, Dr. Byrd performed a procedure that required removing the inactive lead wire through the left femoral vein (located in the upper left leg).
In December 1990, Smith sued Medtronic, alleging negligence, wantonness, liability under the Alabama Extended Manufacturer's Liability Doctrine, and breach of express and implied warranties. Medtronic moved for a summary judgment "as to all causes of action based upon the alleged defects in the Medtronic model [6962] lead, the Medtronic model [6972] lead, and the Medtronic 5984 pacemaker and its component parts," basing its motion on its claim that the applicable statutory period of limitations had expired. The trial court entered a summary judgment for Medtronic. Smith appeals only from that portion of the judgment relating to his claim based on the alleged "defects in the Medtronic model 6972 . . . leadwire."[5] *Page 159 
An action alleging negligence, wantonness, or liability under the AEMLD must be brought within two years after the cause of action accrued. See Ala. Code 1975, § 6-2-38(l). A cause of action based on warranty claims must be brought within four years after the cause of action accrued. See Ala. Code 1975, § 7-2-725(1), (2). A cause of action "accrues" as soon as the party in whose favor it arises is entitled to maintain an action thereon. See Garrett v. RaytheonCo., 368 So.2d 516 (Ala. 1979), for an in-depth discussion of when a cause of action accrues for purposes of the statute of limitations. A party has a cause of action, and the statute of limitations begins to run, on the date the first legal injury occurs, but not necessarily from the date of the act causing the injury. See Brotherhood of Locomotive Firemen Enginemen v. Hammett, 273 Ala. 397, 140 So.2d 832
(1962). That is, where the act complained of does not itself constitute a legal injury at the time, but the plaintiff's injury comes only as a result of, and in furtherance and subsequent development of, the act of the defendant, the cause of action "accrues," and the statutory period of limitations begins to run, " 'when, and only when, the damages are sustained.' " Garrett v. Raytheon Co., supra, at 519, quoting Kelly v. Shropshire, 199 Ala. 602, 605,75 So. 291, 292 (1917). At the time of the first legal injury, the period of limitations begins to run, whether or not the full amount of damages is apparent. Id.; see Stephensv. Creel, 429 So.2d 278 (Ala. 1983); 51 Am.Jur 2d.Limitations of Actions § 135 (1970); Atkins v.American Motors Corp., 335 So.2d 134 (Ala. 1976).
According to Medtronic, the lead is the product in question, because the lead was the product that Medtronic sold and that was implanted in Smith by Dr. Lake — it says the lead insulation and the lead wire were merely components of the product sold. Medtronic argues that the period of limitations applicable to Smith's causes of actions based upon any alleged defect in the inactive lead — either the alleged defect in the lead insulation that occurred in December 1984 or the alleged defect in the lead wire that occurred in March 1990 — began to run in December 1984, when Dr. Lake operated on Smith and discovered the initial defective condition of the inactive lead (the breakdown of the lead insulation), which required replacing the lead through surgery that would have been unnecessary had the lead functioned as it was designed to function. It was at this time, Medtronic says, in December 1984, that Smith sustained an injury, no matter how slight, for which he could have maintained an action against Medtronic; and Medtronic says the limitations period began to run on that date. Therefore, according to Medtronic, because Smith did not file his complaint until December 21, 1990, his claims against Medtronic were barred by the statute of limitations.
According to Smith, the defect in the inactive lead that necessitated the 1984 operation (the deterioration and breakdown of the lead insulation) was a defect in the inactive lead distinct and separate from the defect that required surgery on March 14, 1990, (the deterioration and breaking of the lead wire inside the subclavian vein, causing a life-threatening situation). Relying on the affidavit of Dr. Lake concerning the "noninjurious" effect of the defective insulation, Smith argues that while the allegedly defective insulation was discovered during the 1984 surgery, he sustained no injury at that time. Smith argues that it was not until March 14, 1990, that he sustained a "legal injury," when through a routine X-ray Dr. Lake discovered that the model 6972 lead wire was breaking inside Smith's vein and had caused a life-threatening situation, which necessitated immediate replacement of the model 6972 lead. Smith's contention was supported by Dr. Lake, who stated that "it was not injurious to [Smith] for the 6972 . . . lead [with the defective insulation] to be left inside [Smith's] heart, . . . [that] it had caused and was causing no physical injury to [Smith] at that time," but that it was the "broken lead wire being present in [Smith's] circulatory system . . . on March 14, 1990, [that was injurious to *Page 160 
Smith and that] presented a very likely life-threatening situation." Therefore, Smith argues that his cause of action against Medtronic did not accrue until March 14, 1990, and that the limitations period began to run on that date.
Under the particular facts of this case, although there are no Alabama cases directly on point or even factually similar, we find persuasive Smith's argument that the defective lead insulation and the defective lead wire were separate and distinct defects in the inactive lead for which two separate and distinct causes of action could have been maintained had injury occurred, with the limitations period beginning to run for each cause of action accordingly. In our independent research of the caselaw from other jurisdictions, we found the case of Freedman v. Medtronic, Inc., 171 A.D.2d 499,567 N.Y.S.2d 421 (1991); that case involved the very defendant now before us. That case was factually similar, and we find its rationale and resolution highly persuasive.
In Freedman, a Medtronic pacemaker had been surgically implanted in the plaintiff in 1983. In 1984, the plaintiff underwent surgery to correct a "sensing" malfunction in the pacemaker; at that time it was determined that because the lead wire that had caused the sensing problem could not be removed or repositioned, it would be better to leave the plaintiff with a nonfunctioning (inactive) lead. In September 1986, the plaintiff was again hospitalized to replace the pulse generator pack and it was determined that the pacemaker was "pacing well" and that "[g]ood capture" was achieved. The plaintiff was again hospitalized on May 25, 1987, for acute myocardial infarction, and again on December 22, 1987, for replacement of both the generator power pack and the defective lead wire. On December 23, 1987, the plaintiff sued Medtronic, alleging breach of warranty, negligence, and products liability, contending that the injury-causing malfunction occurred in 1986 when the pacemaker first failed to "capture," not in 1984 when the pacemaker failed to adequately "sense." Relying on hospital records, the plaintiff argued that while the "sensing" malfunction had been diagnosed in 1984, it had caused her no injury, because the pacemaker continued to capture adequately; but, she argued, the failure of the pacemaker to "capture" in 1986 had resulted in heart failure, which necessitated immediate replacement of the system. The plaintiff supported her contentions with an affidavit of a licensed cardiologist, who said that, based on his review of her medical records, he concluded that "the failure to 'capture' was the injury-causing defect and that this first occurred in May of 1986." Based on the evidence, the trial court entered a summary judgment for Medtronic on the breach of warranty claims, but it held that "the affidavit of plaintiff's medical expert, based upon his analysis of plaintiff's medical record, was sufficient to raise a triable issue of fact as to when these causes of action [based on negligence and product liability] accrued." Medtronic appealed. The New York appellate court affirmed, holding that the affidavit of the plaintiff's expert "raised a genuine issue of fact as to the date of the injury-producing malfunction and was sufficient to preclude summary judgment."
In this case, based on our review of the record, we hold that Smith presented substantial evidence to create a genuine issue of fact as to the "date of the injury-producing malfunction" and thereby to defeat Medtronic's motion for summary judgment. Smith presented substantial evidence that although the allegedly defective insulation was discovered in December 1984, it produced no injury to him; that the "injury-causing malfunction" of the product at issue occurred on March 14, 1990, when he underwent surgery as a direct result of an allegedly latent defect in the inactive lead wire; that it was at that time that he could have maintained this cause of action; that it was at that time that this cause of action "accrued"; and, therefore, that it was at that time that the statutory period of limitations on this cause of action began to run.
For the foregoing reasons, we reverse the judgment of the trial court and remand *Page 161 
the case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES and KENNEDY, JJ., concur.
[1] Jimmy Smith's wife filed a claim alleging loss of consortium. Because her claim is derivative, we will speak only in terms of Jimmy Smith's claim.
[2] A "lead" is composed of wire wrapped in insulation and is used to carry from a pacemaker to the heart the electric current that regulates or initiates the heart beat. See 3Schmidt's Attorneys' Dictionary of Medicine P-1-2 (1991).
[3] We note that Smith made other claims not addressed by this summary judgment. The trial court made this summary judgment final pursuant to Rule 54(b), A.R.Civ.P.
[4] This case was filed after June 11, 1987; therefore, the applicable standard of review is the "substantial evidence rule." See Ala. Code 1975, § 12-21-12; West v. FoundersLife Assurance Co. of Florida, 547 So.2d 870
(Ala. 1989).
[5] Smith concedes in his brief that his claims based on defects in the Medtronic pacemaker 5984 and the Medtronic model 6962 lead were time-barred. Smith's appeal relates only to his allegation of a defective condition of the Medtronic model 6972 lead wire, not to an allegation of a defective condition of the Medtronic model 6972 lead insulation.