[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 202 
The mistaken identities and miscommunications involved in this case rival those permeating Shakespeare's earliest comedy and only farce, The Comedy of Errors. Through these mistaken identities and miscommunications Kevin Gilmore and Therese Gilmore were sold the "wrong" house. They sued M B Realty Company, L.L.C., Abigail N. Panayiotou, Property Realty, Inc., and Hattie Clark, alleging against all defendants negligence and wantonness, and against M B and Panayiotou fraudulent misrepresentation. Following pleadings, discovery, and the filing of motions, the trial court entered summary judgments in favor of all defendants on April 18, 2003, without specifying its reasons for entering the summary judgments. The parties agree in their briefs, however, that the rationale of the trial judge must have been either that applicable statutes of limitation barred all of the Gilmores' claims or, as to the fraudulent-misrepresentation claims, that they were untenable because any reliance by the Gilmores on the alleged misrepresentations was unreasonable as a matter of law. The Gilmores appeal.
This Court's review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542
(Ala. 1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997).
Viewing the facts contained in the record most favorably to the Gilmores, the following comedy of errors emerges: The Department of Veterans Affairs (formerly the Veterans Administration) ("the VA") foreclosed on the mortgage it held on a house and lot nowknown to be properly identified by the street address 4360 Bayou Road, Theodore, Alabama. The VA then undertook to sell the property, arranging for Property Realty to act as its "management broker" in the matter. Hattie Clark handled the assignment for Property Realty; her duties included locating and identifying the property, determining whether it was vacant or occupied, determining what rehabilitation might be needed to put it in a condition for resale, and monitoring its status and condition until sold. All of the paperwork the VA sent Clark identified the street address of the house and lot in question as 4369 Bayou *Page 204 
Drive, Theodore, Alabama. The parties agree that there has never been a house on Bayou Drive with the address "4369," and the record offers no explanation as to how the VA misidentified the property.
Following referral of the property to Clark in July 1993, she attempted to locate it using the information supplied by the VA. On September 10, 1993, she completed and transmitted a VA "Property Inspection Report" referencing the address of the property as 4369 Bayou Road, but explaining in the remarks section that "[t]his house has several house numbers. I have chosen to use the one furnished by [the] VA. The Mobile County Courthouse records show the house number to be 4360. The actual number on the house is 4361. The house appears to have been vacant for some time."
As it turns out, the house foreclosed on by the VA that Clark was supposed to locate and inspect was indeed 4360 Bayou Drive. The house the Gilmores were subsequently shown and thought they had purchased, 4361 Bayou Drive, was located across the street from 4360. In her deposition in this case, Clark could not completely recall the events of July through September 1993. Referencing various paperwork from her file, she explained that she never was able to find the address 4369 Bayou Drive, but that she did locate a house with the number 4361 on it and, apparently, there was a sign on that property bearing the name "L.K. Crenshaw Construction," with a telephone number. Her file materials further indicated that, although she had been unable to locate a house bearing the address 4369 Bayou Drive, she had seen a "4370" and learned that there was a "4360"; that address was assigned to a lot she determined to be properly designated by the legal description of "lot 14, resubdivision." Clark's records reflected that she wrote and telephoned the VA trying to straighten out the discrepancy concerning the street address and that, although at some point she concluded that the address was probably 4361 Bayou Drive, the VA continued to designate the property as 4369. A VA memorandum of an August 25, 1993, telephone conversation between a VA representative and Clark indicates that Clark had reported that "she found another Bayou Street [property] which she thinks is the property. She is sending a picture to be sure. Address is: 4369 Bayou Dr., Theodore, AL 36582." A follow-up notation on that memorandum, dated two days later, states: "received pictures and this is correct house." When Clark was asked at her deposition which house she had actually identified, she acknowledged "right this minute, I don't know."
Panayiotou, who in 1993 had been licensed as both a real estate agent and a realtor for over seven years, was affiliated with M 
B. She testified that "[m]aybe 80 percent of our business was either HUD or VA foreclosures." M B occasionally served as a VA management broker, and it and Property Realty were the only two VA management brokers in Mobile County. Any real estate agent "who has signed up with the VA" would have the right to sell VA property that has been assigned to a VA management broker. Every other week those agents received mail from the VA listing the properties it had for sale, providing an address, asking price, any planned repairs, and a cutoff time for offers. Immediately before the events giving rise to the transactions involving the Gilmores, M B had placed an advertisement in a newspaper advising that it had for sale houses on which the VA had foreclosed.
Responding to that advertisement, the Gilmores contacted M B. They were introduced to Panayiotou, the only M B *Page 205 
representative with whom they dealt. She initially showed them a VA foreclosure property, which they rejected because of its deteriorated condition. She thereafter telephoned them to advise them that she had another VA foreclosure available to show them. She gave them directions to the neighborhood where the house was located and then met them there and led them to the house now known to be properly designated as 4361 Bayou Drive. All of the VA paperwork Panayiotou had with her identified the house as 4369 Bayou Drive, but Kevin called her attention to the fact that on a post outside the property someone had affixed "stick figures" reading "4361." According to Kevin, when he pointed out to Panayiotou that the house she was calling 4369 had a number on a post indicating that the address was 4361, she just shrugged her shoulders; according to Therese, Panayiotou stated that "she didn't know why it was like that," but that she would check into it.
After some preliminary negotiations, on November 4, 1993, the Gilmores signed a VA form "Offer to Purchase and Contract of Sale" that listed the property being offered for sale as "4369 Bayou Drive, Theodore, AL 36582." Among the listed "Conditions of Sale" was the fact that "[t]he Purchaser will pay for any examination or continuation of title as he or she may require. . . ." The VA accepted the Gilmores' offer, and the closing for the transaction was scheduled for November 24, 1993.
During her deposition, Panayiotou acknowledged that she had no recollection of the transaction or of the house in question. Relying on the paperwork available to her, and on her knowledge of standard real estate practices, she explained that the listing material identified the house only as 4369 Bayou Drive and that she would have physically located it in the neighborhood by looking for an identifying VA "for sale" sign on the premises, locating the "lockbox," and, once inside, confirming the identity of the house by the "sign-in sheet." That sheet would have reflected "the same identifying number as was on the sheet sent to me by the VA," which Panayiotou's records reflected was "SH 9008." She explained that she would have used the "4369" address on all paperwork because "everything had to correspond to the VA's number."
Of course, it is undisputed that the house Panayiotou led the Gilmores to, accompanied them into, and identified for them in their offer to purchase and contract of sale, was 4361 Bayou Drive, located across the street from 4360, the house the VA actually had for sale, which the VA at all times listed as 4369.
At the November 24, 1993, closing, the Gilmores were given a warranty deed executed by the VA, stating that the VA "granted, bargained, and sold, and by these presents does, grant, bargain, sell, and convey unto" the Gilmores the property known as "Lot 14, Resubdivision of Gulf Park, First Addition, according to Plat therof [sic] recorded in Map Book 11, page 69, Office of Probate Court, Mobile County, Alabama." The VA expressly covenanted to "warrant and defend the premises" to the Gilmores "against the lawful claims and demands of all persons claiming the same by, through, or under Grantor." All of the paperwork given to the Gilmores at the closing that bore a street address designated the property as 4369 Bayou Drive, and on a VA form addressed to the Mobile County tax collector and signed by the Gilmores so as to authorize delivery to the VA as their mortgagee "of all tax bills in connection with the above-described property," the property was described both as "Lot 14, Gulf Park S/D 1st A" and "4369 Bayou Dr., Theodore, AL." *Page 206 
Panayiotou never contacted Clark, and Clark never contacted Panayiotou, to discuss the discrepancies in the street address. Panayiotou never brought the matter up again with the Gilmores until immediately after the closing, when she suggested that they go by the "John Archer Center" in Mobile to see if the street address of the house they had purchased was 4361 or 4369.[1] Therese testified that, because Panayiotou never mentioned the discrepancy in the street address again, and because all of the paperwork at the closing designated the address as 4369 Bayou Drive, she assumed that Panayiotou had resolved the matter in favor of that address.
During the closing, Panayiotou told the Gilmores that they should file for a homestead exemption at the beginning of 1994. According to an affidavit filed by Therese, Panayiotou explained
 "what claiming the homestead would do and specifically told me how to go about doing it. [She] told me that when I went to claim the homestead exemption, I would be signing a document that would be our tax appraisal/bill. She explained to me how the clerk would fill in proper pronouns for my signature."
Therese went to the county courthouse in January 1994 and presented her deed to a clerk, "who took it and looked something up." The clerk returned with a tax-assessment form, "filled in the pronouns on the left-hand side" and told Therese to sign the form where the clerk had placed an "x."
The defendants have put into the record a copy of the document signed by Therese on that occasion, captioned "Tax Return List Real and Personal Property." Immediately under that caption are the names of the Gilmores and the address of 4369 Bayou Drive. The property assessed is shown to be "Lot 14 Resub of Gulf Park 1 ST Add MBK 11 pg 69." Numerous other entries, some made cryptically in the form of abbreviations or technical numerical references, appear on the form. Therese's signature appears in its lower left corner. The reproduction of the form in the record is partially "cut off" and blurred on the left side, so that the date of Therese's signature and the text of the certificate she signed is unreadable. In the upper right portion of the form, under such entries as "Key 1298045 Sta 287 Mo," is the reference "LOC: 4360 Bayou Dr." Therese's affidavit states:
 "In looking at the document, I saw that it had the legal description mention [ed] in our deed and it had the address we had been given throughout the course of this purchase, which was 4369 Bayou Drive. Since I believed that everything was in order, I signed the document. At no time did I inspect the document more thoroughly or see the information over on the right-hand side in the top right-hand corner labeled, `Loc: 4360 Bayou Dr.' I did not see that information at anytime prior to filing the lawsuit in the matter, nor was I ever informed, nor was my husband ever informed at any time that the legal description of Lot 14 carried a street address of 4360 Bayou Drive. At the time I signed the homestead exemption, I was not aware that tax bills could be sent to any address. I thought they could only be sent to the address of the homeplace and when I saw the address of 4369 Bayou Drive, which was at the *Page 207 
top of the document, I thought that address was equated to the lot 14 Resubdivision of Gulf Park, since that was the address that had been given to us by Ms. Panayiotou and used throughout all of our closing documents. Subsequent, we received a yearly copy of our tax bills which were paid by our mortgage company through an escrow account. Those bills do not contain any information about 4360 Bayou Drive or mention that address. . . . Even if I had seen it [the reference to 4360 Bayou Drive], I am not certain I would have understood what that meant since the only contending addresses that we had ever seen were 4361 Bayou Drive, which was the address on the house we were shown by the real estate agent, and 4369 Bayou Drive, which was the address on all the paperwork that we were shown by the real estate agent at the time we made our offer of purchase and later at the closing."
The Gilmores moved into the house without first going by the John Archer Center to verify the address. Within approximately three months, however, they experienced problems receiving their mail using the 4369 address and went to the Center to determine just what was the proper mailing address. There they met with a clerk who showed them a large map; Kevin pointed to a lot corresponding with the lot they occupied, and the clerk told them that the proper mailing address for that particular lot was 4361 Bayou Drive.
The Gilmores occupied the house and lot at 4361 Bayou Drive uneventfully from November 1993 until April 11, 1999, making various improvements to the premises and making all of their mortgage payments. On April 11, 1999, Mr. L.K. Crenshaw appeared at their house and told them that he actually owned it. This claim prompted Therese to travel to a branch office of the Mobile County Revenue Commissioner where personnel assisted her in discovering that the house and lot she and her husband had occupied since 1993 was not lot 14, but rather lot 22 of the resubdivision of Gulf Park, first addition, and that lot 14 was actually the lot across the street, the street address of which was 4360 Bayou Drive. Confronted with the fact that they did not have legal title to the house they had occupied for five years and five months, the Gilmores vacated it upon Mr. Crenshaw's demand. The record contains no information about when or how Mr. Crenshaw had obtained his superior title or where he had been during those years the Gilmores resided in the house.
The house actually identified by the Gilmores' deed, across the street at 4360, was still occupied by other persons, as it had been when the Gilmores took occupancy of 4361. The Gilmores eventually evicted those persons, but the house was in such a distressed condition that they could not occupy it. They filed this action on August 7, 2000.
It is not necessary to discuss the various instances of negligence and wantonness the Gilmores assert the defendants were guilty of, because none of the acts or omissions about which the Gilmores complain transpired after the November 1993 closing. Accordingly, by the time the Gilmores filed their lawsuit on August 7, 2000, over six years had elapsed after the operative events. The Gilmores concede that § 6-2-38(l), Ala. Code 1975, prescribes a two-year statute of limitations for their negligence and wantonness claims, measured from the date of injury. They attempt to avoid the bar of the expiration of that limitations period by arguing that they experienced no injury at the time of the closing of the transaction on November 24, 1993, but rather that "the injury occurred *Page 208 
when the true owner of the house first appeared at the [Gilmores'] doorstep in 1999." (Gilmores' brief, at 11.) In that regard, the Gilmores misperceive the law.
As this Court recently explained in Chandiwala v. PateConstruction Co., 889 So.2d 540, 543 (Ala. 2004):
 "The statute of limitations on a claim begins to run when the cause of action accrues. Home Ins. Co. v. Stuart-McCorkle, Inc., 291 Ala. 601, 285 So.2d 468
(1973). A cause of action accrues as soon as the claimant is entitled to maintain an action, regardless of whether the full amount of the damage is apparent at the time of the first legal injury. Smith v. Medtronic, Inc., [607 So.2d 156 (Ala. 1992)]; Garrett v. Raytheon Co., 368 So.2d 516, 518-19 (Ala. 1979). In Kelly v. Shropshire, 199 Ala. 602, 604-05, 75 So. 291, 292 (1917), the rule was stated as follows:
 "`"If the act of which the injury is the natural sequence is of itself a legal injury to plaintiff, a completed wrong, the cause of action accrues and the statute begins to run from the time the act is committed, be the actual damage [then apparent] however slight, and the statute will operate to bar a recovery not only for the present damages but for damages developing subsequently and not actionable at the time of the wrong done; for in such a case the subsequent increase in the damages resulting gives no new cause of action. Nor does plaintiff's ignorance of the tort or injury, at least if there is no fraudulent concealment by defendant, postpone the running of the statute until the tort or injury is discovered."'"
As we likewise explained in Koch v. State Farm Fire CasualtyCo., 565 So.2d 226, 231 (Ala. 1990): "A negligence cause of action accrues as soon as the claimant is entitled to maintain an action, regardless of whether the full amount of damages is apparent at the time of the first legal injury." See also Bookerv. United American Ins. Co., 700 So.2d 1333, 1339-40 (Ala. 1997); and Henson v. Celtic Life Ins. Co., 621 So.2d 1268,1271-74 (Ala. 1993).
Had the Gilmores learned the true nature of the property mix-up immediately after the transaction had closed and they began occupying the premises, they could have begun prosecution then of the same negligence and wantonness claims they asserted in August 2000. Their negligence and wantonness claims accrued in November 1993 and were time-barred when they filed their action in August 2000.
The Gilmores make an alternative argument, in an attempt to avoid the limitations bar to the maintenance of their negligence and wantonness claims, citing Becton v. Rhone-Poulenc, Inc.,706 So.2d 1134, 1135-36 (Ala. 1997), for the proposition that "a plaintiff's ignorance of the fact of the injury through a fraudulent concealment by defendant postpones the running of the limitations period." Becton simply states that proposition conversely, stating "[a] plaintiff's ignorance of the fact of injury, if there is no fraudulent concealment by the defendant, does not postpone the running of the limitations period." 706 So.2d at 1135-36. That principle had no application in Becton, and the Gilmores develop in their argument no basis for its application in this case, other than to argue that the defendants never affirmatively disclosed to the Gilmores their pre-closing inattention to detail and failure of "follow-through." The Gilmores point to no subsequent and independent efforts by any of the defendants affirmatively to conceal their alleged negligence and wantonness, and, therefore, the Gilmores fail to *Page 209 
present a cognizable claim of "fraudulent concealment."
Accordingly, we affirm the summary judgments for Property Realty and Hattie Clark in their entirety. Likewise, we affirm the summary judgments for M B and Panayiotou as to the claims of negligence and wantonness.
With respect to the fraudulent-misrepresentation claims against M B and Panayiotou, § 6-2-3, Ala. Code 1975, is applicable; that statute provides as follows:
"Accrual of claim — Fraud
 "In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action."
In their initial brief, the Gilmores explain that their fraud claims arose out of the alleged misrepresentations they contend Panayiotou made that "the house being shown by [her] was in fact for sale" and that the house being shown had recently been painted and had a new roof.
 "[T]he limitations period begins to run when the plaintiff was privy to facts which would `provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud.' . . . see also Jefferson County Truck Growers Ass'n v. Tanner, 341 So.2d 485, 488 (`Fraud is deemed to have been discovered when it ought to have been discovered. It is sufficient to begin the running of the statute of limitations that facts were known that would put a reasonable mind on notice that facts to support a claim of fraud might be discovered upon inquiry.')."
Auto-Owners Ins. Co. v. Abston, 822 So.2d 1187, 1195 (Ala. 2001).
 "A purchaser's `reliance is reasonable in the absence of independent knowledge sufficient to arouse the purchaser's suspicion, and he is not obligated to make an independent investigation as to the truth of the seller's representations absent such knowledge.' . . . `If the circumstances are such the reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover.'"
Ex parte ERA Marie McConnell Realty, Inc., 774 So.2d 588, 591
(Ala. 2000) (emphasis omitted).
These cases represent the application of the reasonable-reliance standard for determining when the statutory limitations period applicable in a fraud case begins to run, a standard to which this Court returned in Foremost Insurance Co.v. Parham, 693 So.2d 409 (Ala. 1997). Under the reasonable-reliance standard, "`if a consumer plaintiff, acting as a reasonably prudent person exercising ordinary care, would have discovered the "true facts" before acting on the alleged misrepresentation, then, as a matter of law, the plaintiff could not have relied on the misrepresentation.'" Foremost, 693 So.2d at 418 (quoting Johnson v. State Farm Ins. Co., 587 So.2d 974,977-79 (Ala. 1991)). Under the reasonable-reliance standard,
 "the trial court can enter a judgment as a matter of law in a fraud case [based on the expiration of the statutory limitations period] where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms [that *Page 210 
clearly contradicted the alleged misrepresentations]."
693 So.2d at 421.
The Court explained in Foremost that the documents the plaintiffs in that case had received, but had chosen not to read, would have put a reasonable person on notice of the true facts, "if read or even briefly skimmed," and the plaintiffs themselves acknowledged that had they read the documents, they would have learned the true facts inconsistent with the alleged misrepresentations. 693 So.2d at 422. As we explained in Exparte Seabol, 782 So.2d 212, 216 (Ala. 2000), the plaintiffs inForemost"could have easily read" the documents in question and determined the true facts, with the result that their "failure to read the insurance documents would not have tolled the running of the limitations period, under the reasonable-reliance standard," but that a different result could arise under application of that standard in a case where, such as in Seabol,"the documents at issue are not as easily understood." To like effect, see Potterv. First Real Estate Co., 844 So.2d 540, 552 (Ala. 2002).
The reasonable-reliance standard was well stated in Torres v.State Farm Fire Casualty Co., 438 So.2d 757 (Ala. 1983), a case decided before the Court abandoned the reasonable-reliance standard in favor of the justifiable-reliance standard in Hickoxv. Stover, 551 So.2d 259 (Ala. 1989). In Torres the Court explained that "[i]n order to recover for misrepresentation, the plaintiff's reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover." The Foremost Court explained that reasonable reliance was a practical standard because it would "allow the fact-finder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding the transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties." Foremost, 693 So.2d at 421. Therefore, in this case it is significant, as it was in Potter, supra, 844 So.2d at 552, that the Gilmores were first-time home buyers; the reasonableness of their reliance must be measured taking that circumstance into consideration.
In making determinations concerning the proper application of the reasonable-reliance standard in the context of determining whether the statute of limitations poses a bar to a fraud action, this Court is aware that "`[t]he question of when a party discovered or should have discovered the fraud is generally one for the jury.' Liberty Nat'l Life Ins. Co. v. Parker,703 So.2d 307, 308 (Ala. 1997)." Seabol, 782 So.2d at 216. Likewise, however, there is a "general duty on the part of a person to read the documents received in connection with a particular transaction. . . ." Foremost, 693 So.2d at 421. Finally, we are mindful in our analysis of the application of these principles to the facts of this case that the burden is on the Gilmores to show that they come within the "discovery" tolling provision of §6-2-3. Lowe v. East End Mem'l Hosp., 477 So.2d 339 (Ala. 1985);Seabol, supra.
M B and Panayiotou argue that there is no genuine issue of material fact as to when the alleged fraud was discovered and that the Gilmores did discover, or should have discovered, the alleged fraud well outside of two years before they filed their action.
First, they contend that because the Gilmores had actual knowledge of the discrepancy between the street addresses of *Page 211 
"4369" and "4361," the Gilmores should have been alerted "to the potential that the VA was mistaken about the address prior to the sale." Although we agree with that proposition, it does not translate to the broader proposition that, as a matter of law, the Gilmores should have been alerted to the need to investigate whether the house they were being shown and ultimately purchased was actually the one the VA was offering for sale. Obviously, Panayiotou, a realtor with extensive experience in handling sales of houses foreclosed by the VA, was not provoked to further inquiry despite the fact that she knew everything the Gilmores knew about the discrepancy in the street address. As summarized in her brief, "Panayiotou testified that she identified this property by checking the VA number on her documentation with the information contained on the sign, lockbox and sign-in sheet on the property." Asked during her deposition, "Would [the discrepancy in the numbers] not have raised a red flag that maybe the wrong house had been identified as the house for sale?" she stated, "I would have been going by the identifying sign, lockbox, and sign-in sheet" and, therefore, "would have taken it as golden that that was the house the VA was offering for sale."
"[I]n determining the issue of reliance based on all of the circumstances surrounding [this] transaction," including the "relative sophistication . . . of the parties," Foremost, 693 So.2d at 421, we cannot say as a matter of law that the Gilmores, as first-time home buyers, unreasonably relied on Panayiotou's representations concerning the status of the house they were being shown. All that was uncertain was whether the final digit of the street address was a "1" or a "9"; the discrepancy was not such that we can say, as a matter of law, that "facts were known which would put a reasonable mind on notice that facts to support a claim of fraud might be discovered upon inquiry." JeffersonCounty Truck Growers Ass'n v. Tanner, 341 So.2d 485, 488 (Ala. 1977), quoted in Abston, 822 So.2d at 1195.
M B and Panayiotou next argue that the Gilmores were "contractually obligated to assure themselves of valid title through a title search, which they declined to do [and] that had [they] performed the title search, they would have easily discovered that the property the VA was purporting to sell them was not, in fact, owned by the VA because the Lot Number (14) on the deed was the Lot Number for '4360 Bayou Drive,' not '4361 Bayou Drive.'" M B and Panayiotou cite Jefferson County v.Mosley, 284 Ala. 593, 226 So.2d 652 (1969), for the proposition that "a purchaser of real property is charged with notice of all documents on record within his chain of title which could have been discovered through a reasonably diligent search." (M B and Panayiotou's brief, at 19.) We agree that Mosley supports that proposition. Additionally, M B and Panayiotou cite Haines v.Tonning, 579 So.2d 1308, 1310 (Ala. 1991), for that same proposition:
 "Under Ala. Code 1975, § 35-4-90, the proper recordation of an instrument constitutes `conclusive notice to all the world of everything that appears from the face' of the instrument. Christopher v. Shockley, 199 Ala. 681, 682, 75 So. 158, 158 (1917). Thus, purchasers of real estate are `presumed to have examined the title records and knowledge of the contents of those records is imputed [to them].' Walker v. Wilson, 469 So.2d 580, 582 (Ala. 1985) (quoting J.H. Morris, Inc. v. Indian Hill[s] Inc., 282 Ala. 443, 212 So.2d 831 (1968))."
We disagree, however, that the Gilmores were contractually obligated to conduct an independent title search. Rather, the "Offer *Page 212 
to Purchase and Contract of Sale" executed by them stated only that they would have to pay for any title examination they might choose to conduct. The VA, as grantor, gave them a statutory warranty deed (see § 35-4-271, Ala. Code 1975) containing the express covenant that the VA "will warrant and defend the premises to the said Grantee(s) herein . . . forever, against the lawful claims and demands of all persons claiming the same by, through or under Grantor." We attach no significance to the fact that the Gilmores elected to rely solely on the warranties made to them by the VA and not to incur the additional expense of having a title examination independently done.
The principles stated in Mosley and Haines do not require us to conclude, as a matter of law, that the Gilmores were charged with notice of facts equivalent to a discovery of the falsity of Panayiotou's representation concerning the identity and location of the house they were buying. The deed from the VA declared that it was selling the Gilmores lot 14, resubdivision of Gulf Park, first addition. The VA form addressed to the tax collector, which the Gilmores were given at closing, stated that the street address for that legal description was "4369 Bayou Drive." It is undisputed that the VA had previously taken a mortgage on lot 14, had foreclosed on it, and was offering the property for sale. Presumably, a title search undertaken by the Gilmores would have shown only that lot 14 had previously been titled in the name of the VA's mortgagor, that the VA had duly foreclosed its mortgage and obtained a foreclosure deed, and that the VA was therefore in a position to sell the property to the Gilmores. There is no evidence in the record to suggest that any document the Gilmores might have encountered in examining documents in their chain of title would have reflected a street address for the property. After the closing, Panayiotou recommended only that the Gilmores check at the "John Archer Center" to determine the correct mailing address for the house and lot they had just purchased, as between "4361" and "4369" Bayou Drive.
Considering "all of the circumstances surrounding [the] transaction, including the . . . relative sophistication . . . of the parties," we cannot conclude that application of the reasonable-reliance standard requires the holding, as a matter of law, that the Gilmores are charged with what a title examination would have revealed, not just of their chain of title, but of the plat book depicting the subdivision of which the deeded lot was a part. The constellation of circumstances existing at the time the Gilmores left the closing, including the final instructions Panayiotou had given them about checking into the proper address at the "John Archer Center," were not such as to impose a duty of inquiry on the Gilmores, as a matter of law, of consulting a plat book to see if the house and lot they had been led to, and shown, by Panayiotou, equipped with a VA "for sale" sign, a lockbox, and a sign-in sheet, and which everyone present at the closing understood to be the property being conveyed, was in fact the lot and house actually being conveyed.
Finally, M B and Panayiotou argue that even if prior events had not triggered the running of the statutory limitations period under the discovery rule, Therese's signing of the homestead exemption application form did so. M B and Panayiotou acknowledge that the form bore the address of "4369 Bayou Drive" in its upper left portion, but contend that the entry "LOC: 4360 Bayou Drive" appearing "[j]ust a few inches to the right" should have alerted Therese to inquire further. In point of fact, the 4369 street address Therese saw is located on the left side of *Page 213 
the form some five or six inches from the 4360 number on the right side, at least with respect to the dimensions of the form reproduced in the record, and Therese's signature, appearing in the lower left corner of the form, is separated from the "4360" entry by some seven inches. That form was not a document forming a part of, or supplied in connection with, the transaction between the Gilmores and the VA, or between them and M B and Panayiotou as selling real estate agents for the VA, but rather is a document that did not come into existence until several months after the real estate transaction was closed. Therese's statement that she never saw the statement "LOC: 4360 Bayou Drive" on the form is undisputed, and M B and Panayiotou have pointed to no circumstances that would have imposed on Therese a duty to review every portion of the form before signing where she was directed by the clerk to sign. Stated another way, the question is whether it was unreasonable as a matter of law for Therese, after having noted the 4369 Bayou Drive street address on the form, and the lot 14 legal description conforming to the one in her deed, to sign the form as directed without first checking all of the various other entries spread across the face of the form. We cannot answer that question affirmatively.
Therefore, we conclude that the particular circumstances of this case, viewed in a light most favorable to the Gilmores, do not establish, as a matter of law, a "discovery" by them of facts sufficient to trigger a running of the applicable statutory limitations period at a point in time more than two years before they filed their lawsuit.
With respect to the related issue — whether the Gilmores met their burden of proof of establishing by substantial evidence the element of their fraud claim that their reliance on Panayiotou's representations concerning the identity and location of the property she was offering to sell was reasonable — M B and Panayiotou refer us to the principles articulated in Ex parteERA Marie McConnell Realty Co., supra, as quoted above. Our analysis of the "reasonable-reliance" issue in the context of the triggering of the statute of limitation is dispositive of the separate issue concerning the reasonable-reliance element of the fraud claim itself. As expressed in ERA, "`[a] purchaser's reliance is reasonable in the absence of independent knowledge sufficient to arouse the purchaser's suspicion, and he is not obligated to make an independent investigation as to the truth of the seller's representation absent such knowledge.'" 774 So.2d at 591 (emphasis omitted). We cannot say the Gilmores' reliance on Panayiotou's representation as to the status of the house she led them to and showed them through, which representation she continued through the closing, was unreasonable as a matter of law, given all of the attendant circumstances.
As previously noted, Panayiotou's present position is essentially that the Gilmores, even as first-time home buyers, should have suspected and investigated the possibility of "mistaken identity" with respect to the location of the house she showed them, despite the fact that such a possibility never occurred to her, a realtor sophisticated in the area of listing houses on which the VA had foreclosed. Panayiotou knew that M B and Property Realty were the only two companies serving as VA property-management brokers in the Mobile area; Panayiotou, unlike the Gilmores, would have known to check with Property Realty, and Hattie Clark specifically, if she had had any doubt about the physical location, as opposed to mailing address, of the property she was showing. The record provides no information as to *Page 214 
exactly how Panayiotou determined the location of the house to which she led the Gilmores, but she was clear in her testimony that there must have been present on the premises all of the trappings of a VA foreclosure resale and that the sign-in sheet located inside the house must have contained a listing number identical to the one provided her by the VA for the house she was authorized to show and sell.
As noted, the Gilmores additionally claimed that Panayiotou misrepresented to them that the house they were shown had been recently painted and had a new roof. They argue in their brief to this Court that after discovery was conducted in this case, "it was discovered that neither house [i.e., neither 4360 or 4361] had been recently painted or had new roofs." Therese testified on deposition that Panayiotou told her and Kevin that the house "had some exterior things that had been done to it, like a new roof" and that "it had been painted so it could be sold." Asked if the roof had looked new when they moved into the house, Therese replied, "[a]s much as you look at a roof and say it looks like its in decent shape"; when asked if it appeared that the house had been painted, she replied, "[i]t could have been." Panayiotou acknowledged in her deposition, that, based on her memory, the VA listing supplied her indicated that the VA had put a new roof on the house to be sold. The only attack M B and Panayiotou make on these separate claims of misrepresentation is by way of the following footnote at page 32 of their brief to this Court:
 "Plaintiffs also present an alternative fraud argument regarding alleged statements made by Abby Panayiotou about alleged roof repairs and painting on the house. This is a classic `red herring' argument, designed to divert this Court from the actual issue in this case concerning the erroneous address. Regardless, the purported statements by Abby about these repairs are supported by the VA's initial inspection report, which noted that roof repairs and painting would be required on the property. . . . Furthermore, Plaintiffs presented no evidence as to their reliance on these statements or to meet their burden of proving that any claim would fall under the savings provision of Ala. Code § 6-2-3, so this issue may be properly disregarded by this Court."
Although the referenced inspection report does include the recommendations of Hattie Clark, as the property-management broker, that "[h]ouse needs to be power washed and painted, both the bricks and wood area," and "[r]epair roof on well[?]," the "Review Authorization" portion of that report, subsequently completed and signed by a representative of the VA, recites the decision that "no repairs to be undertaken at this time." Hattie Clark testified that no roof was put on the house for which the recommendations were made, nor was any painting done on it, and that "[n]o work was done on the house period. . . . Nothing was done to the house."
With respect to the argument in the footnote in their brief that the Gilmores "presented no evidence as to their reliance on these statements or to meet their burden of proving that any claim would fall under the saving provisions of Ala. Code § 6-2-3," we note that M B and Panayiotou did not include in either their original or their renewed motion for a summary judgment any argument about an absence of evidence of reliance on the part of the Gilmores, as opposed to the reasonableness of that reliance, and they did not, and do not now, present any argument as to why any reliance by the Gilmores on these separate representations would have been unreasonable. *Page 215 
For the reasons explained above, we hold that the trial court erred in concluding that no genuine issues of material fact existed with respect to the issue whether the Gilmores' fraud claims were barred by the statute of limitations, or with respect to whether their reliance on Panayiotou's representations was unreasonable and that, as a matter of law, M B and Panayiotou were entitled to a summary judgment in their favor on those claims.
 Conclusion
We affirm the summary judgments in favor of Hattie Clark and Property Realty. We affirm that aspect of the summary judgments in favor of M B and Panayiotou relating to the Gilmores' claims of negligence and wantonness. We reverse the summary judgments in favor of M B and Panayiotou with respect to the Gilmores' fraud claims, and we remand this case for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
LYONS, JOHNSTONE, and WOODALL, JJ., concur.
HOUSTON and SEE, JJ., concur in part in the rationale and concur in the result.
STUART, J., concurs in part and dissents in part.
[1] Nowhere in the record or in the briefs of the parties is there an explanation of the nature of the "John Archer Center"; we infer from some of the references to it that it houses a governmental agency from which could be ascertained the correct street addresses for houses in the Theodore area.